UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

Plaintiff,

v.

CURTIS T. HOLDEN,

Defendant.

No. CR-11-2064-RHW

**ORDER DENYING DEFENDANT'S MOTIONS FOR ACQUITTAL AND NEW TRIAL**

Before the Court are Defendant's Motions for Acquittal and New Trial, ECF Nos. 219, 221. Defendant moves for an acquittal under Federal Rule of Criminal Procedure 29, or for a new trial under Federal Rule of Criminal Procedure 33, following his December 2012 conviction by a jury on 32 counts of health care fraud, in violation of 18 U.S.C. § 1347(a)(2).

The Government [1] has responded, ECF No. 254, to which Defendant has replied. ECF No. 267. The Court held a hearing in this matter on March 26, 2013, in Yakima, Washington. The Defendant was present and represented by Philip Wetzel. Aine Ahmed and Mary K. Dimke appeared on behalf of the Government. The Court is fully informed, having reviewed all documents in support of, and in opposition to the Motions. For the reasons set forth below, the Motions are **denied**.

[1] The Government also filed an excerpt of the record ("ER") with the trial transcript and related exhibits. ECF Nos. 255 [ER 1-429], 255-1 [ER 430-494], 255-2 [ER 495-538], 255-3 [ER 539-551].

## I. BACKGROUND

Defendant Curtis T. Holden, DPM, is a podiatrist and sole owner of Advanced Podiatry Specialists, P.S. ("Advanced Podiatry"), a medical clinic specializing in the treatment of foot and ankle disorders. Advanced Podiatry is based in Yakima, Washington. In addition to accepting private insurance, Defendant also enrolled as a medical provider in 2001 with the Medicare Part B and Washington State Medicaid Programs. Through these programs, Advanced Podiatry provided foot and nail care to beneficiaries covered by public health care plans, which included many elderly and disabled patients.

Advanced Podiatry also contracted with other podiatrists who were employed by Defendant, including Michael Lee, DPM, and Troy Morton, DPM. Dr. Lee was employed at Advanced Podiatry from 2002 to 2007. Dr. Morton worked at Advanced Podiatry from April of 2006 to April of 2007. However, Defendant controlled Advanced Podiatry's billing for all claims submitted to health care benefit programs for reimbursement. This included the patients treated by Drs. Lee and Morton.

In early 2007, the Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), received a hotline compliant regarding Advanced Podiatry. HHS-OIG then referred the case to the Federal Bureau of Investigation ("FBI") and the Western Integrity Center [2] ("WIC"), due to a shortage of resources. As a result of their joint investigation, the FBI and HHS-OIG then conducted interviews with Advanced Podiatry's Medicare beneficiaries. In

[2] WIC (now known as AdvanceMed Corporation) is a Medicare contractor for the Centers for Medicare and Medicaid Services ("CMS"). WIC investigates health care fraud or abuse on behalf of CMS. This includes conducting medical reviews of claims, whereby medical charts are compared to the billing data submitted by the physician, to determine if any overpayment exists. WIC then determines whether a particular case merits referral to law enforcement, including HHS-OIG. *See generally* ER 26-27, Tr. 47-49; ER 31-32, Tr. 65-72.

addition, both agencies interviewed the current and former employees of Advanced Podiatry. On August 2, 2007, a search warrant was executed at Advanced Podiatry, based on the investigations of WIC, the FBI, and HHS-OIG. Federal agents seized numerous electronic and paper records, including patient records, billing records, appointment records, and training materials. Also, in February of 2010, law enforcement seized various assets under Defendant's control, which are the subject of pending forfeiture counts.

The Government eventually charged Defendant in a 44-count indictment, alleging a scheme to defraud various health care benefit programs (namely Medicare, Medicaid, and a private insurance company called Healthcare Management Administrators or "HMA"), from 2004-2010. *See* Second Superseding Indictment, ECF No. 68. Counts 1-41 alleged health care fraud, in violation of 18 U.S.C. § 1347(a)(2), while Counts 42-44 charged making false statements relating to health care, in violation of 18 U.S.C. § 1035(a)(2). *Id.* The Indictment also contained forfeiture allegations, which the parties agreed would be determined by the Court, apart from any jury trial.

The Government contended that Defendant knowingly and willfully executed a scheme to defraud by submitting false and fraudulent claims to the health care benefit programs [3] named above. Specifically, the charges represented three general schemes: (1) submitting claims for reimbursement of medical

---

[3] These programs pay claims using a national billing coding practice based on a five-digit Current Procedural Terminology ("CPT") code system. The CPT codes and manual are compiled and published by the American Medical Association. The CPT codes are meant to account for the length of the doctor's visit with the patient, the complexity involved in the medical decision making, and the patient's medical history. Based on the services provided, a physician then selects a CPT procedure code and a separate diagnosis code ("ICD-9"), which are then submitted to insurers for reimbursement. The CPT codes and corresponding diagnosis codes allow the insurance company to ascertain what procedure was claimed and the supporting diagnosis. *See generally* ER 217, Tr. 490; ER 28-29, Tr. 55-62.

services that were not actually provided; (2) "upcoding" or submitting claims for a "higher" level service than the one actually provided; and (3) coding patient visits to indicate the patient was seen by a physician for "evaluation and management," when the patient was not actually seen by a physician.

The Court then held an eight day jury trial in Yakima, Washington. On the fifth day of trial, Defendant made a Rule 29 motion, which the Court denied as to the health care fraud Counts 1-41. ER 288-89, Tr. 771-73. The Court reserved ruling on the false statement Counts 42-44, contingent upon the jury's verdict. *Id.* at 771; ER 368, Tr. 1083-84. On the seventh day of trial Defendant moved for a mistrial, citing his objection to the admission of "other acts" evidence. ER 372-73, Tr. 1101-03. His main objection focused on the admission of the "whiting out" of "date created" on information from electronic medical chart notes, created in response to a June 2006 Washington Labor and Industries audit ("L & I audit"). *Id.*

Defendant argued such evidence was not relevant to any charged scheme to defraud or the charged counts. *Id.* The Government argued such evidence was "inextricably intertwined" with the scheme to defraud, as alleged between 2004 to 2010. ER 372, Tr. 1099-1102. The Government asserted that Defendant's conduct in creating chart notes in response to an audit was consistent with the charged counts "in terms of creating chart notes or not having chart notes and billing for services that weren't substantiated by the records." ER 372, Tr. 1100.

After a lengthy sidebar outside the presence of the jury, the Court overruled Defendant's objection and found the L & I audit evidence to be "inextricably intertwined" with the scheme to defraud. ER 369-73, Tr. 1087-1103. The Court then denied Defendant's motion for a mistrial, and stated the issue of whether the "whiting out" evidence was properly admitted as "inextricably intertwined" would be addressed in post-trial motions. ER 372, Tr. 1101-02.

A jury ultimately convicted Defendant on 32 counts of health care fraud (Counts 3-6, 7-10, 14-18, 21, 24-40, and 41). ECF No. 217. The jury acquitted Defendant on nine counts of health care fraud (Counts 1-2, 11-13, 19-20, and 22-23), and on three false statement counts (Counts 42-44). *Id.*

Citing numerous errors, Defendant now renews his motion for judgment of acquittal, or in the alternative, requests a new trial. *See* Memorandum in Support of Renewed Motion for Judgment of Acquittal or for New Trial, ECF No. 245. The Court now addresses each alleged error in turn.

## II. LEGAL STANDARD

### A. Rule 29 Acquittal Standard

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Evidence is insufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Nevils,* 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc).

Viewing the evidence in the light most favorable to the prosecution requires the Court to "presume . . . that the trier of fact resolved any . . . conflicting inferences in favor of the prosecution." *United States v. Rosales,* 516 F.3d 749, 752 (9th Cir. 2008). The reviewing court "must respect the exclusive province of the fact-finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Hubbard,* 96 F.3d 1223, 1226 (9th Cir. 1996).

///

**B. Rule 33 New Trial Standard**

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court's power under Rule 33 is much broader than under Rule 29. *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000). Unlike with Rule 29, "[t]he court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *Id.* If, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," the court may set aside the verdict and grant a new trial. *Id.* (citing *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980)).

## III. DISCUSSION

**A. Defendant's Motion for Acquittal**

**1. Health Care Fraud**

In order for a defendant to be convicted of the crime of health care fraud, the Government must prove four elements beyond a reasonable doubt:

> (1) The Defendant knowingly and willfully executed, or attempted to execute, a scheme or artifice to defraud a health care benefit program, or to obtain money . . . by means of false or fraudulent pretenses, representations, or promises;
>
> (2) The false or fraudulent pretenses, representations, or promises related to a material fact;
>
> (3) The Defendant acted willfully and intended to defraud; and
>
> (4) The Defendant did so in connection with the delivery of or payment for health care benefits, items, or services.

Court's Final Jury Instructions, ECF No. 203 at 9; *see also United States v. Awad*, 551 F.3d 930, 938-39 (citing 18 U.S.C. § 1347(a)(2)).

**2. Counts 3-6: Patient W.F.**

Counts 1-6 correspond to patient W.F. and avulsions [4] that were billed by Advanced Podiatry on dates of service June 23, 2006 (Counts 1-2), October 6, 2006 (Counts 3-4), and February 14, 2007 (Counts 5-6). *See* ECF No. 68, ¶ 29. The Government alleged that Defendant submitted false claims to Medicare for reimbursement of avulsions performed (utilizing CPT codes 11730 and 11732 and diagnosis code 7030), due to the patient's in-grown nails, when nail avulsions were not the service actually provided. *Id*. Thus, the scheme to defraud involving these counts alleged that Dr. Holden upcoded the service actually performed from routine nail care to billing for six avulsions – which resulted in a higher level of reimbursement.

Based on the testimony of W.F., Dr. Morton, Dr. Tanner (the Government's expert witness), Dr. Holden and Government's Exhibits 2, 3, 6, 7, 8, 11, 12, 13, 15, and 16, the jury acquitted on Counts 1-2 and convicted on Counts 3-6.

Defendant argues the evidence is insufficient to sustain his conviction on Counts 3-6. ECF No. 245 at 17, 39.

With respect to Counts 3-6, Dr. Morton testified that he created the chart notes associated with the dates of service October 6, 2006 and February 14, 2007. ER 203-04, Tr. 433-35; ER 204-05, Tr. 438-39. The chart notes reflected the patient received routine nail care: "debride [5] nails one through five" and "return in 9 weeks" for a follow-up. ER 401, Ex. 6; ER 405-06, Ex. 11. The chart notes also reflected that "no clinical signs of infection" were found. *Id.* Dr. Morton testified

---

[4] An avulsion of a nail is the removal, in part or whole, of the nail plate from the nail bed in an attempt to remove as much of the nail as possible and usually to relieve pain or disease. ER 218, Tr. 494.

[5] Debridement is a procedure to reduce the size and thickness of the nail. ER 218, Tr. 93; ER 220, Tr. 499. This procedure usually involves the mechanical or electrical sanding of a nail plate too thick to otherwise trim. *Id.*

the chart note did not indicate that avulsions were performed on these dates, as he would have documented such a procedure. ER 203, Tr. 433-35; ER 204-05, Tr. 438-39. Dr. Morton also testified that after an avulsion, a patient was typically seen by the provider within seven to ten days for follow-up care. *Id.*

In contrast, W.F.'s chart notes revealed a follow-up appointment was scheduled in nine weeks for "nail care." ER 401, Ex. 6; ER 405-06, Ex. 11. The Community Living [6] Doctor's Order also supported the conclusion that W.F. was seen for only routine nail care and callus trimming, with a follow-up appointment scheduled in two months. ER 404, Ex. 8; ER 409, Ex. 13. In addition to the evidence cited above, Dr. Tanner testified that the chart note did not support billing for avulsions, as there was no documented use of anesthesia or follow-up noted consistent with this procedure. ER 223, Tr. 512-513; ER 224, Tr. 515-17.

In response, Defendant argued that patient, W.F., who suffered from cerebral palsy, did not require anesthesia as he had no or limited feeling in his feet or toes. Defendant also pointed out that Dr. Morton did not specifically recall treating W.F., despite his testimony that he created the chart note. ER 203, Tr.434. Defendant testified that the avulsions billed were performed on W.F., based on his recollection of the patient's treatment and the superbill. [7] ER 334-35, Tr. 952-55. Defendant also testified the patient had fungal nails, which supported an ingrown toenail diagnosis. ER 335, Tr. 954.

Patient W.F. testified that he was treated by Advanced Podiatry for "nail care and callus trimming." ER 177-78, Tr. 331-33. He also testified that at times he

[6] Community Living is a residential program that supports people with developmental disabilities, like patient W.F. ER 93, Tr. 226.

[7] A superbill is a preprinted document that contains various CPT codes generally related to the practice. Typically, a provider would circle or handwrite on the superbill the CPT codes utilized, which would then be used to submit bills to health care benefit programs by office staff and medical coders. ER 56, Tr. 166-67

could feel pain in his feet. *Id.* W.F. denied having been told he had fungal nails. ER 178, Tr. 335. However, Patient W.F. could not recall whether avulsions were performed or if he received injections for anesthesia. ER 178, Tr. 333.

The evidence demonstrated that Defendant submitted claims to Medicare on October 9, 2006 and February 23, 2007, entering CPT and diagnosis codes reflecting that four avulsions were performed due to an ingrown nail with infection. ER 410-11, Exs. 15, 16. Defendant received payments for the claims on October 20, 2006 and March 2, 2007. ER 411, Ex. 16.

In the light most favorable to the prosecution, the evidence presented at trial would allow a rational trier of fact to conclude that the Government proved the crime of health care fraud, including intent, beyond a reasonable doubt. Here, the jury could have inferred willful intent from the absence of documentation in the chart notes regarding avulsions. *See, e.g., United States v. Semrau*, 693 F.3d 510, 525 (6th Cir. 2012) (noting in a Section 1347 prosecution that "a rational jury could infer a failure to perform [medical services] from a failure to document, particularly when the importance of chart documentation is stressed heavily during trial") (internal citation and quotation omitted); *see also United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007) ("[W]illfullness may be inferred from circumstantial evidence of fraudulent intent"). Also, numerous courts have upheld convictions in a § 1347 prosecution where the scheme to defraud involved upcoding. *Semrau*, 693 F.3d at 530 (collecting cases).

As in *Semrau*, the Government in this case relied heavily on the importance of chart documentation -- as emphasized by Dr. Tanner's testimony regarding Counts 1-6. *See e.g.,* ER 221, Tr. 506. From the outset, the Government stressed the importance of charting, and its relation to medical billing. Govt.'s Opening, ECF No. 241 at 8-10; Govt.'s Closing, ER 394, Tr. 34-35. As stated above, Dr. Morton's testimony also indicated there was no evidence in the chart notes to

reflect avulsions were performed, or that a diagnosis supporting in-grown nails was appropriate. Thus, the jury could rationally conclude that Defendant intended to receive a higher payment for services he did not provide, when he falsely submitted claims to Medicare and billed four avulsions regarding patient W.F., when the service provided was actually routine nail care and callus trimming.

**3. Counts 7-10: Patient M.L.**

Counts 7-10 correspond to patient M.L. and four matrixectomies [8] that Advanced Podiatry billed on date of service February 27, 2007. *See* ECF No. 68, ¶ 30. The Government alleged that Defendant submitted false claims to Medicaid for reimbursement of matrixectomies performed (utilizing CPT codes 11750), when in fact, nail excisions were not the service actually provided. *Id*. Based on the testimony of M.L., Dr. Lee, Dr. Morton, Dr. Tanner, Deb Frerich (a paralegal hired by Defendant to review medical records), Government's Exhibits 20-23, and Defendant's Exhibits 501-04, the jury convicted on Counts 7-10.

Defendant argues these charges were an error, as he presented evidence that other matrixectomies occurred within the same time period (two weeks prior) that were not billed. ECF No. 245 at 45. To support this theory, Defendant called Ms. Frerich, a paralegal who reviewed Advanced Podiatry medical records and testified that three other patient chart notes existed, prior to patient M.L.'s date of service, that had not been billed. ER 307-08; Tr. 848-855. However, Defendant did not treat or enter the billing associated with these patients -- Dr. Lee did. ER 310, Tr. 857, 859, 860.

---

[8] A matrixectomy (also known as nail excision) is the permanent removal of all or part of the nail, and involves the actual destruction of the nail root. ER 219-20, Tr. 498-500. The intent of doing a matrixectomy is to prevent the nail from growing back. *Id*. Common methods of removing the nail bed include surgery, acid, or electricity, while the patient is anaesthetized. *Id*.

M.L. testified that she received only routine diabetic nail care, and had no surgeries or procedures to permanently remove her toenails in February of 2007. ER 282, Tr. 747. The chart note created during the patient's visit was consistent with her testimony and noted the procedure performed: "debride nails one through five bilaterally . . ." and also suggested that she "return in 9 weeks" for additional nail care. ER 413, Ex. 20. Advanced Podiatry records indicate that Dr. Morton saw M.L. on February 27, 2007, and created her chart note. ER 414-15, Ex. 21. Dr. Morton testified that if he performed a matrixectomy, it would have been noted as such on the chart. ER 205, Tr. 441-42; ER 416, Ex. 22. Dr. Lee also testified that he saw M.L. ten weeks after the alleged nail removals, yet she still had all of her toenails. ER 125, Tr. 43. Finally, Dr. Tanner testified that the chart note did not support the billing for matrixectomies, as there were no notes indicating nail excisions, no consent form signed by the patient, and no follow-up plan consistent with this type of procedure. Day 4, ER 225, Tr. 519-22.

The record reflects that on March 6, 2007, Defendant submitted claims to Medicaid, entering CPT and diagnosis codes reflecting that M.L. had four matrixectomies (excision of nails), performed on February 27, 2007. ER 410-11, Exs. 15, 16. Defendant received payment for these claims on May 7, 2007. ER 417, Ex. 23.

Here, a rational juror could have again concluded that Defendant's "billing decisions were based on obtaining the highest reimbursement amounts rather than a good faith attempt to report the actual services rendered." *Semrau*, 693 F.3d at 526. This conclusion was not only supported by circumstantial evidence regarding chart documentation, but more importantly by the direct testimony of M.L. that she did not receive maxtrixectomies on the date in question. Thus, a rational juror could find that Defendant falsely submitted claims with the intent to defraud

Medicaid, by billing four nail excisions involving patient M.L., while the evidence at trial indicated the service actually provided was routine diabetic nail care.

**4. Counts 14-18, 21, 24-40: Patient J.L.**

These counts correspond to patient J.L. *See* ECF No. 68, ¶ 32. Counts 14-18, 21, and 24-40, involved 23 separate claims submitted to Medicare for Evaluation and Management ("E & M") office visits (CPT codes 99213 and 99214). *Id.* These claims were submitted by Advanced Podiatry for dates of service ranging from February 12, 2007 to April 20, 2007. *Id.* In addition, Counts 19-20 and 22-23, involve claims submitted to Medicare for four ultrasounds on February 21 and 23, 2007 (CPT code 76880). *Id.* The Government alleged that Defendant falsely billed for E & M office visits, while the patient actually received Microvas [9] treatments. The Microvas treatments were administered by office staff and not a physician, as required by the CPT codes. As to the ultrasound counts, the Government asserted that Defendant simply billed for a service not actually performed.

Based on the testimony of J.L., Dr. Lee, Dr. Tanner, Teresa Barton (medical assistant), Dorothy Hoopes (Advanced Podiatry biller), and Marti Martinell (Advanced Podiatry office manager) and Government's Exhibits 36, 37, 38, 39, 41, and 71, the jury convicted on Counts 14-18, 21, 24-40 (the "E & M Counts"). However the jury acquitted Defendant on Counts 19-20 and 22-23 (the "ultrasound Counts").

Defendant argues the evidence was insufficient to prove that he willfully charged for these treatments with the intent to defraud. ECF No. 245 at 42-42. He asserts that billing for Microvas was confusing as to whether it was reimbursable by Medicare, and that he simply used the wrong code. *Id.*

[9] Microvas is a non-invasive physical therapy treatment that delivers electromagnetic energy to targeted areas of the body in order to help with neuropathy pain and increase circulation. ER 124, Tr. 39; ECF No. 163 at 9.

The Government introduced evidence that to bill for an E & M office visit under CPT code 99214, two of the following three components were required: (1) a detailed history; (2) a detailed examination; or (3) medical decision making of moderate complexity. ER 523, Ex. 71. This E & M code also noted that the presenting problems should be of moderate to high severity. *Id.* A physician typically spends 25 minutes of face-to-face time with the patient and/or family when this code is billed. *Id.* Likewise, CPT code 99213 required two of the following three requirements: (1) an expanded problem focused history; (2) an expanded problem focused examination; or (3) medical decision making of low complexity. ER 524, Ex. 71. Typically, a physician spends 15 minutes of face-to-face when utilizing this code and the patient's problems are minor. *Id.*

J.L testified that as a patient of Advanced Podiatry she received Microvas treatments two to three times a week. ER 179, 337-39. J.L. testified these procedures were performed by medical assistants. *Id.* She also testified that she saw a physician only twice. *Id.* Advanced Podiatry records confirmed J.L. was treated with Microvas from February 12, 2007 to April 20, 2007. ER 418-28, Ex. 36; ER 483, Ex. 38. In fact, medical assistant Teresa Barton, who provided J.L.'s Microvas treatments, testified that no medical history or examination was performed, nor was the patient seen by a doctor. ER 182, Tr. 348-50. Dr. Lee also testified that Microvas patients rarely saw a doctor. ER 124, Tr. 39-40. Dr. Tanner testified that J.L.'s chart note showed no evidence that she was examined by a physician. ER 230-31, Tr. 542-46. The Government also submitted J.L.'s chart notes -- which were blank as to any treatment records or provider notes. ER 429-59, Ex. 37.

In contrast, Advanced Podiatry records showed that J.L.'s Microvas treatments were submitted to Medicare as E & M visits. ER 484, Ex. 38; ER 485, Ex. 39. In fact, Exhibit 38 lists the provider as "NURSE." ER 483, Ex. 38. The

evidence also indicated that a Microvas treatment lasted 45 minutes. ER 340, Tr. 977. Nevertheless, Defendant billed the treatments under two different E & M codes, which required different lengths of face-to-face time with the patient. *Id.* The evidence revealed that Defendant entered the majority of the billing information for J.L., with the exception of two dates of service. ER 494-495, Ex. 41. Finally, Defendant listed Dr. Morton as the physician provider who treated J.L. during her Microvas treatments billed as E & M visits. ER 494-95, Ex. 41.

Dorothy Hoopes, a former biller employed by Defendant, testified that in 2006 Advanced Podiatry experienced issues related to how to bill for Microvas. ER 262-63, Tr. 668-70. In response to Medicare's denial of Microvas treatments, Marti Martinell, then office manager of Advanced Podiatry, testified that Defendant instructed the billing staff to bill the disputed procedures as E & M office visits, despite the fact that patients, including J.L., did not see a physician. ER 274, Tr. 715-17; ER 280, Tr.740. Dr. Tanner testified that there was no evidence within the chart notes that J.L. saw a physician during her Microvas treatments. ER 231, Tr. 545. Dr. Tanner also testified that an "other" code exists which doctors can use when they bill for a procedure that may or may not be covered by Medicare. ER 234-35, Tr. 558-59.

In sum, despite Defendant's argument that Microvas billing was confusing and that he lacked the requisite *mens rea*, a rational juror could find that the Government's evidence established beyond a reasonable doubt that Defendant falsely submitted claims with the intent to defraud Medicare.

**5. Count 41: Garden Village Patients**

Count 41 corresponds to patients seen by Dr. Lee at the Garden Village nursing facility. *See* ECF No. 68, ¶ 33. Count 41 also involved a series of claims submitted to Medicare for Evaluation and Management ("E & M") office visits, billed under CPT codes 99309 and 99310. ER 516, 517, Ex. 45. These claims were

submitted by Advanced Podiatry for 22 patients treated by Dr. Lee on date of service January 6, 2006. The Government alleged that from January 6, 2006, through February 27, 2007 (the date of the last payment received), Defendant submitted 17 false claims to Medicare for patients seen by Dr. Lee. *Id.*

Specifically, the Government argued that Defendant upcoded Dr. Lee's superbills on 17 claims to reflect that E & M visits (using CPT code 99309 and 99310) were performed, when routine nail care and debridement were actually the services rendered. Based on the testimony of Dr. Lee, and Government's Exhibits 42, 43, 44, 45, and 72, the jury convicted on Count 41.

Defendant argues that he was convicted on "general evidence," in that the Government did not present "specific evidence" discussing a particular date or patient. ECF No. 245 at 21, 46-47. He argues a dispute existed as to the level of care required by these patients, and that Dr. Lee was undercoding – which, in turn, justified Defendant's changes to Dr. Lee's superbills. *Id.*

The Government introduced evidence that to bill for an E & M office visit to a nursing facility under CPT code 99309, two of the following three components were required: (1) a detailed interval history; (2) a detailed examination; or (3) medical decision making of moderate complexity. ER 526, Ex. 72. This E & M code also noted that the "patient has developed a significant complication or a significant new problem." *Id.* Similarly, the more complex CPT code 99310 required two of the following three requirements: (1) a comprehensive interval history; (2) a comprehensive examination; or (3) medical decision making of high complexity. ER 527, Ex. 71. This code noted that "the patient may be unstable or may have developed a significant new problem requiring immediate physician attention. *Id.*

The evidence showed that on January 6, 2006, Dr. Lee treated 22 residents at the Garden Village, a skilled nursing facility. ER 496, Ex. 42. Dr. Lee testified that

he completed a pre-printed Advanced Podiatry superbill (designed specifically for nursing home visits), which he marked-up with the corresponding CPT and diagnosis codes. *Id.*; ER 134, Tr. 79. Dr. Lee then gave the superbill to Defendant, which included Dr. Lee's handwritten chart notes detailing the services performed. *Id.;* ER 499-503, Ex. 43. Defendant then upcoded 17 out of the 22 CPT and supporting diagnosis codes. ER 498, Ex. 43. The majority of the codes were changed from CPT code 11721 (debridement of six or more nails) to CPT codes 99309 and 99310, reflecting a higher level of service and reimbursement. *Id.*

Dr. Lee testified that these changes were not supported by his chart notes, or the services he provided. ER 134-36, Tr. 79-88. Significantly, Dr. Lee also testified that Defendant had previously instructed him to "diversify" his coding, in order to avoid a Medicare audit. ER 120, Tr. 24. This diversification included an instruction to bill routine foot care and debridement as higher level E & M codes, including to upcode to CPT codes 99309 and 99310. ER 120-121, Tr. 21-28. Dr. Lee also testified that he did not typically take vitals or a medical history, and on average, spent only five to ten minutes with the nursing home patients. ER 120, Tr. 23. In addition, Dr. Tanner testified that Dr. Lee's chart notes did not support the codes increased by Defendant. ER 232-33, Tr. 548-51. The Government also presented evidence that Defendant routinely upcoded Dr. Lee's nursing home visits, with respect to patients seen at other facilities. ER 505-15, Ex. 44.

Defendant then submitted the upcoded Garden Village claims to Medicare. ER 516-17, Ex. 45. Advanced Podiatry received payment for the last of these claims on February 16, 2007. *Id.*

Here, Dr. Lee's testimony supports the conclusion that a rational juror could find that Defendant acted willfully, and with the intent to defraud, when he upcoded Dr. Lee's Garden Village superbills. Dr. Lee testified that the changes made by Defendant were not the services he provided. Moreover, the jury could

have drawn a permissible inference that Defendant falsely submitted CPT codes that were not based on the chart documentation. *Semrau*, 693 F.3d at 525. Finally, the jury could also find intent to defraud from Defendant's instruction to Dr. Lee to "diversify his billing" in order to avoid an audit. *See Dearing*, 504 at 901 (intent to defraud "can be inferred from efforts to conceal the unlawful activity . . ."). Therefore, a rational juror could find Defendant willfully engaged in a scheme to defraud Medicare by falsely upcoding claims to reflect that higher level E & M codes were the service provided, when the patients actually received routine nail care.

Accordingly, contrary to Defendant's argument that the evidence was "general" and insufficient to convict, the Court finds after a careful review of the record, there was sufficient evidence from which a rational juror could conclude beyond a reasonable doubt that Defendant committed health care fraud. Under Rule 29, the Court cannot grant the Defendant's Motion for Acquittal on Counts 3-6, 7-10, 14-18, 21, 24-40, and 41.

**B. Defendant's Motion for New Trial**

**1. The Court Properly Admitted Evidence of Prior Audits and Reimbursements as Inextricably Intertwined with the Scheme to Defraud**

The heart of Defendant's motion for a new trial rests on his argument that the Court improperly admitted uncharged other acts evidence. ECF No. 245 at 29-34. He contends such evidence is not "inextricably intertwined" with the schemes to defraud, as alleged by the Government. *Id.* Specifically, Defendant points to the admission of "whiting out" evidence which related to electronic chart notes created in response to the June 2006 L & I audit. *Id.* Defendant characterizes this evidence as Rule 404(b) evidence that required at least a limiting instruction. Defendant also argues the admission of reimbursement evidence, related to Counts 42-44, was an additional error that merits a new trial. *Id.* The Government has multiple theories

about how this evidence is "inextricably intertwined" to the scheme to defraud and charged conduct. *See* ECF No. 254 at 26-31.

**a. Overview of Prior Audits and "Whiting Out" Evidence Presented at Trial**

At trial the Government introduced evidence of three prior audits. ER 392, Tr. 25-27. The Government argued this evidence was offered to show intent and knowledge of the overall scheme to defraud, which existed between 2004 and 2010. ER 369, Tr. 1089; ER 372, 1102. A central part of the Government's case was that Defendant did not create chart notes at the time of service and submitted whatever CPT code he wanted to bill for, regardless of the service actually provided. According to this theory, when audited, Defendant would then generate chart notes to match what had been previously billed. Thus, Defendant was able to conceal from the auditors the fact that chart notes were not created on the date the patient was treated. The Government argued that Defendant instructed Dr. Lee to "fabricate" chart notes during audits to match what had been billed and also to "diversify" his coding in order to avoid audits.

The Government outlined this theory in opening argument, previewing the testimony of Dr. Lee, Dr. Morton and Paula Klingele. Govt.'s Opening, [10] ECF No. 241 at 17-19. The Government then submitted exhibits regarding the "whiting out" evidence, in the form of an electronic patient file seized from Defendant's computer. ER 530, Ex. 81. The patient, J.A., was not a patient charged in Counts 1-44. *See* ECF No. 68. Special Agent Simpson, HHS-OIG, testified that she printed Exhibit 81 from Defendant's electronic chart files, after execution of the search warrant in 2007. ER 50, Tr. 142-43. This exhibit revealed that the patient was seen

[10] The Government did not include a transcript of its opening argument in the excerpt of record, having mistakenly appended the transcript of its closing argument twice. *See* ER 9-22. Thus, the court cites to the docket sheet when referencing the Government's opening argument. *See* ECF No. 241.

on December 7, 2005, yet bore a "created" on date stamp of June 1, 2006. *Id.* Dr. Morton would later confirm that he created Exhibit 81 on June 1, 2006, six months after J.A. was treated by Defendant. ER 530, Ex. 81; ER 208, Tr. 451.

The Government also introduced Exhibit 82 through Agent Simpson. ER 52, Tr. 152; ER 537, Ex. 82. Agent Simpson testified that she requested Exhibit 82 from Michael Pierce of L & I. ER 52-53, Tr. 152-53. Exhibit 82, J.A.'s chart note submitted to L & I, revealed no date created on information and contained Defendant's signature. ER 537, Ex. 82. Otherwise, Exhibit 82 was identical to Exhibit 81, as to Patient J.A., date of service December 7, 2005. *Compare* ER 530, Ex. 81 *with* ER 537, Ex. 82.

Over Defendant's relevancy and untimely confrontation clause objections, the Court admitted Exhibits 81 and 82. ER 51-52, Tr. 148-151. The Court recognized that to be relevant to Defendant this evidence "would have to be something that was part of the scheme that either he did or was done with his knowledge or was done by somebody in furtherance of the scheme." *Id.* at Tr. 150. The Court then noted that although Defense counsel's objections were untimely, it cautioned him "you should remember that, if no testimony ties this up later, to raise it to me, and I will either strike that portion or I'll give a specific instruction to the jury, because I don't think you can make that nexus without testimony." ER 52, Tr. 151. As this evidence was admitted prior to the witness testimony regarding the "date created" and whiting out evidence, the Court gave a cautionary instruction to the jury that although Exhibits 81 and 82 were admitted, the fact that the "dates are different, doesn't tell us any more than that right now." ER 53, Tr. 154-55.

In order to make this connection, the Government later called Michael Pierce, audit supervisor for the Washington Department of Labor and Industries. Mr. Pierce testified that he provided Exhibit 82 to Agent Simpson. ER 664-65, Tr.

676-79. He further testified that he would have approached the Advanced Podiatry audit differently had he known the chart notes were created in response to the audit. *Id.*

Dr. Lee testified that while employed at Advanced Podiatry, Defendant had been involved in a prior audit. ER 123, Tr. 33-35. Defendant instructed Dr. Lee that he could bill routine nail care (trimming the corners of a patient's nail) as an avulsion, which resulted in a higher level of reimbursement. ER 123, Tr. 35-36. Dr. Lee admitted this was not proper practice, or the service actually provided. *Id.* Thus, from this initial audit Defendant learned that in order to bill for an avulsion, the chart note needed to reflect anesthesia was administered -- or Medicare/Medicaid would not pay the claim. *Id.* Dr. Lee also explained the general process of how Advanced Podiatry responded to an audit. *Id.* This included modifying and creating chart notes (if none existed) to reflect what was billed. ER 123, Tr. 33-34.

Dr. Lee testified that he participated in a second audit, whereby he modified and created chart notes to falsely include anesthesia on procedures billed as avulsions, as set forth above. ER 123, Tr. 34. The chart notes were created to match what had been previously billed. ER 123, Tr. 36

Dr. Lee also discussed a third audit that occurred after Dr. Morton joined the practice in 2006. ER 124, 37-38. The third audit is the subject of Defendant's motion for a new trial and involved a June 2006 Medicaid audit by the Washington State Department of Labor & Industries ("L & I" audit). ER 369, Tr. 1090.

Dr. Lee testified at that time Advanced Podiatry maintained patient chart notes electronically. ER 124, Tr. 37-38. These electronic chart notes included a "date created" modifier located at the bottom of the record. *Id.* Thus, if a doctor later created a new record or modified an existing one, after treating the patient, the computer automatically updated the chart note to reflect the most recent date of the

modification. *Id.* Dr. Lee testified that in order to eliminate the "date created" information from patient chart notes associated with the audit, the records were printed out and the date "whited-out." The records were then photocopied, reviewed and signed by Defendant, and submitted to Medicaid auditors. *Id.* Dr. Lee testified that Defendant also participated in the activity of whiting out and generating chart notes for prior patient visits.ER 124, Tr. 38; ER 137, Tr. 92.

Other employees testified about the "whiting out" evidence as well. Dr. Morton testified that shortly after joining Advanced Podiatry, he participated in the reconstruction of chart notes for the June 2006 L & I audit. ER 202-03, Tr. 429-32. Dr. Morton testified that he transcribed paper chart notes from Defendant's patients he had not treated into electronic format. *Id.* Some of the patient chart notes dated back six months to 2005. Dr. Morton confirmed the "date created" was whited-out from the bottom of the recently created chart note, and then photocopied by a member of the office staff. *Id.* Dr. Morton testified that Defendant directed these activities. *Id.* Dr. Morton also confirmed Defendant's later testimony, that he reconstructed charts using the superbill and Dr. Holden's past recollection of having seen the same patients for reoccurring problems. ER 210, Tr. 460-61. Dr. Morton testified on cross-examination that they "weren't making things up" and that he tried to reconstruct chart notes based on what actually happened. *Id.*

Paula Klingele, a former biller at Advanced Podiatry, testified that after Dr. Morton created the chart notes, she whited-out the "date created" information and shredded the original. ER 104-05, Tr. 270-75. She then submitted a copy to Defendant for his review and signature. *Id.* The Government also elicited testimony from Ms. Klingele that after the search warrant was executed in August of 2007, Defendant and Dr. Morton decided they weren't going to discuss the whiting out of "date created" information. ER 107, Tr. 282-84. Defendant then

instructed Ms. Klingele not to talk to law enforcement about the "whiting out" and creation of chart notes in response to the L & I audit. ER 107, 283-84.

Marti Martinell (also known as Marti Conner), then office manager at Advanced Podiatry, testified that in response to an audit, chart notes were being generated and the "date created" on information whited-out. ER 271, Tr. 701-702. She testified this was done at Defendant's instruction and the chart notes were then submitted to the auditing agency. *Id.* She further testified that Dr. Morton was generating patient chart notes for patients he had not treated. *Id.*

Defendant testified that he helped Dr. Morton reconstruct "accurate" chart notes for the L & I audit, by utilizing the superbill and his recollection of having seen the same patient multiple times for recurring medical issues. ER 333, Tr. 947-48. He testified that the chart notes created were accurate and the "services were performed as billed." ER 334, Tr. 950. However, Defendant denied that he personally participated in the whiting out incident. ER 334, Tr. 950-51. Defendant claimed that Dr. Morton and Paula [Klingele] had whited out the "date created" information without his knowledge, and he merely signed the patient charts. ER 334, Tr. 950. Defendant then testified that he did not learn about the whiting out incident until over a year after the L & I audit, on the day of the search warrant in August of 2007, or shortly thereafter. ER 334, Tr. 951.

Finally, in closing the Government argued that the "ninth way [it] established [D]efendant's intent in this case is the fabricating of chart notes during audits to match what had been billed." ER 392, Tr. 25. The Government again briefly detailed the evidence of the prior audits presented at trial. *Id.* at Tr. 26. The Government argued "[a]udit after audit, you see deceitful conduct from the [D]efendant . . . [t]his is not the action of a person who's trying to get it right . . . it's actions of a person who wants to hide, who wants to conceal, and who wants to cheat." *Id.* at Tr. 27.

**b. Inextricably Intertwined Evidence – Legal Standard**

"Evidence of 'other acts' is not subject to Rule 404(b) [11] analysis if it is 'inextricably intertwined' with the charged offense." *United States v. Beckman,* 298 F.3d 788, 793-94 (9th Cir. 2002) (citing *United States v. Vizcarra–Martinez,* 66 F.3d 1006, 1012 (9th Cir. 1995). The Ninth Circuit recognizes two categories of "inextricably intertwined" evidence, which may be admitted without regard to Rule 404(b). *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004).

First, evidence of prior acts may be admitted if the evidence "constitutes a part of the transaction that serves as the basis for the criminal charge." *Id.* This requirement is satisfied if the offenses are part of a "single criminal episode" with other charged crimes. *Vizcarra–Martinez,* 66 F.3d at 1012-13. Acts falling within the same criminal episode are not inadmissible simply because the defendant is indicted for less than all of his actions. *Id.*

The Ninth Circuit has expressly held other instances of conduct that are part of the same criminal scheme are admissible as inextricably intertwined with the charged conduct. *See e.g., United States v. Montgomery*, 384 F.3d 1050, 1061-62 (9th Cir. 2004) (evidence of 1,006 instances of mail fraud admissible as "inextricably intertwined" with 1 conspiracy count and 19 counts of mail fraud where each instance was part of the conspiracy); *United States v. Sayakhom*, 186 F.3d 928, 938-39 (9th Cir. 1999) (evidence admissible of continuing scheme to defraud an entity other than that charged in the indictment); *United States v. Serang*, 156 F.3d 910, 915 (9th Cir. 1998) (government not precluded from

[11] Rule 404(b) provides that evidence of "other crimes, wrongs, or acts" is inadmissible to prove character or criminal propensity, but is admissible for other purposes (intent, plan, knowledge). Fed. R. Evid. 404(b). To admit evidence of prior bad acts it must: (1) tend to prove a material point in issue; (2) not be too remote in time; (3) be proven with evidence sufficient to show the act was committed, and; (4) if admitted to prove intent, must be similar to the offense charged. *United States v. Beckman*, 298 F.3d 788, 794 (9th Cir. 2002).

introducing evidence relevant to entire conspiracy or scheme simply because a defendant is indicted for less than all of their actions.); *United States v. Mundi*, 892 F.2d 817, 820 (9th Cir. 1989) (where defendant charged with scheme to defraud one travel agency, evidence was admissible regarding ten other agencies to which the scheme extended).

Second, 'other acts' evidence may be admitted without regard to Rule 404(b) when it is necessary:

> to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime; it is obviously necessary in certain cases for the government to explain either the circumstances under which particular evidence was obtained or the events surrounding the commission of the crime.

*Vizcarra–Martinez*, 66 F.3d at 1012-13. The jury "cannot be expected to make its decision in a void—without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." *Id.* at 1013 (internal citation omitted).

In such cases, 'other acts' evidence is not character evidence, but "'direct evidence,' used to flesh out the circumstances surrounding the crime with which the defendant has been charged, thereby allowing the jury to make sense of the testimony in its proper context." *United States v. Ramirez–Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992); *see also DeGeorge*, 380 F.3d at 1220.

**c. Evidence of Prior Audits and "Whiting Out" Was Properly Admitted as Inextricably Intertwined**

The Government argues that Defendant's involvement in directing that chart notes be generated, modified, and falsified during audits is direct evidence of the scheme to defraud. ECF No. 254 at 25. The Government alleged three ways in which Defendant defrauded health care benefit programs: (1) submitting claims for reimbursement of medical services that were not actually provided (Counts 19-20, 22-23); (2) "upcoding" or submitting claims for a "higher" level service than the one actually provided (Counts 1-13, 41, 42-44); and (3) coding patient visits to

indicate the patient was seen by a physician for "evaluation and management," when the patient was not actually seen by a doctor (Counts 14-18, 21, 24-40). *See* ECF No. 68. The Government alleged a general scheme to defraud beginning in 2004 and ending in 2010, although the individual counts involve patients treated by Advanced Podiatry from 2006-2007 (Counts 1-41) and 2010 (Counts 42-44). *Id.*

The Government gives multiple reasons why Defendant's involvement in directing that chart notes be generated during audits is intrinsic to the schemes alleged and crimes charged:

> (1) Part of the Defendant's scheme was to bill for whatever service he chose, which included not making chart notes at the time of service. By not creating a detailed chart note of the actual service performed, Defendant, when notified of an audit, simply made up chart notes to match what was improperly billed;
>
> (2) Defendant's action in concealing the date on which the chart notes were created/generated is indicia of fraud;
>
> (3) Audits are designed to detect fraud, and by deceiving auditors about the dates the chart notes were created, Defendant perpetuated his scheme to defraud health care benefit programs;
>
> (4) Defendant submitted false and misleading records to auditors and investigators, which equates to lying. Making false statements to conceal participation in a scheme to defraud is intrinsic to the charged crime;
>
> (5) The evidence is necessary to explain the entirety of Defendant's scheme to defraud health care benefit programs.

ECF No. 254 at 26-28.

Defendant argues the admission of the white-out evidence and creation of chart notes in response to audits was "classic" 404(b) evidence, as the Government offered this evidence to show intent and knowledge. ECF No. 245 at 8-9; *see also* ER 222, Tr. 510. Defendant argues such evidence does not relate to the scheme to defraud as alleged by the Government or the counts charged in the Indictment. *Id.*

at 29-30. Defendant also contends this evidence was not necessary to present the jury with a "clear and comprehensible story" of the commission of the crime. ECF No. 267 at 7-8. Defendant asserts there is no evidence that the work was not actually done in regard to chart notes created for the L & I audit. As a result, this gave the jury "a sense that something [was] "wrong" without actually tying back to any charged schemes. *Id.* at 5. Further, Defendant submits that without a limiting instruction or Rule 404(b) analysis, the Court improperly admitted the evidence and a new trial is required.

To be clear, the Court did not take the admission of the L & I evidence lightly:

> THE COURT: If it's inextricably intertwined, then it was properly admitted. If it wasn't, it was improperly admitted because it's other acts that show other bad acts. The government is not claiming it's 404(b), so they're riding on inextricably intertwined. So I believe if he's convicted, and I find that it was not inextricably intertwined, I will have [to] give you a new trial.

ER 372, Tr. 1101. The Court also concluded that because this evidence was referenced throughout the Government's case-in-chief, it could not be cured with a limiting instruction or disregarded by the jury. ER 372-73, Tr. 1102-03. In fact, on multiple occasions throughout the trial the Court emphasized to the parties, and outside the presence of the jury, that neither improper charting nor re-creating records in response to an audit was evidence of any crime or fraud. ER 222, Tr. 507-10; ER 347, Tr. 1004.

In contrast, it would be fraudulent to submit a claim for a procedure that was not performed or to "make up chart notes to justify getting paid with the intent to defraud." ER 222, Tr. 510. Ultimately, the Court did not limit such evidence because the Government represented it was admissible as to the scheme to defraud. ER 369, Tr. 1087-88. After a thorough review of the record and briefing on this issue, the Court finds the evidence was properly admitted as "inextricably

intertwined" with the scheme to defraud health care benefit programs for the following reasons. As such, no limiting instruction or Rule 404(b) analysis was required.

First, the evidence was properly admitted as "inextricably intertwined" with the scheme to defraud. *See e.g., United States v. Benavides*, 470 Fed. App'x 782, 787-88 (11th Cir. 2012) (concluding that evidence of the defendant's uncharged participation in a prior health care fraud scheme was admissible as inextricably intertwined with the charged offense). Here, the Government properly charged a scheme to defraud involving billing for services not actually provided to the patient. *See Semrau*, 693 F.3d at 529 (noting that "it is difficult to imagine a more obvious way to commit healthcare fraud than billing for services not actually rendered."). As part of that scheme, the Government argued that Defendant did not make chart notes at the time of service and instead, billed for whatever service he chose. ECF No. 241 at 9-10. In those cases, the only documentation of the service provided was the paper superbill. Specifically, the Government tied this evidence back to charged Counts 1 and 2, involving patient W.F.

There, Defendant failed to generate a chart note on June 23, 2006, but billed for avulsions that were not documented in the Community Living order, nor consistent with the follow-up instructions noted on the same. ECF No. 68 at ¶ 29. The Government also points out that these counts were in temporal proximity to the L & I audit which took place in June of 2006. ECF No. 254 at 27.

In addition, the Government's expert testified that without a chart note it is virtually impossible to ascertain what service the physician provided. Thus, the Government's case rested heavily on the importance of chart documentation. ER 217, Tr. 489-90; ER 221, Tr. 506. As set forth above under the Court's Rule 29 analysis, this gave the jury a permissible impression that services not documented were not performed. *Semrau*, 693 F.3d at 525. Conversely, it is also true that a

failure to chart did not necessarily imply that the services billed were not actually provided, absent further evidence of intent to defraud. ER 370-71, Tr. 1094-95.

However, the Government provided this link through the testimony of Dr. Lee. Defendant downplays the significance of Dr. Lee's testimony regarding the creation of chart notes in response to an audit. *See generally* ER 123-24, Tr. 33-39. Dr. Lee testified that Defendant instructed him to insert false information into chart notes, which included documentation that anesthesia was provided. ER 123, Tr. 34-36. This was done in furtherance of Defendant's scheme to defraud and to support the billing of avulsions for claims already submitted to auditors. In these cases, Dr. Lee testified there was no anesthesia given and that the service actually provided was routine nail care or "clip[ping] the corner of [the patient's] toenails." *Id.* These lower-level procedures were then billed as higher paying avulsions. *Id.* This was the exact manner in which the scheme to defraud involving patient W.F. (Counts 1-2) was allegedly perpetrated by Defendant. In Counts 1-2 there were no chart notes created at the time of service. Similarly, the Government argued that Defendant actually provided routine nail care to W.F., but billed Medicare for avulsions. ER 221, Tr. 505. In addition, Counts 3-6 involved the same scheme and conduct, except that Dr. Morton testified that he created chart notes associated with those counts, which did not support billing for avulsions. ER 371, 1098.

Moreover, in the Court's opinion, this evidence did not allow the jury to convict Defendant of health care fraud, based solely on the inference that a failure to create a chart note contemporaneously was illegal. As detailed in the Rule 29 analysis, the jury also heard patient testimony, the testimony of Advanced Podiatry physicians who worked for Defendant, and former Advanced Podiatry staffers and billers. The evidence at trial revealed that Defendant exercised sole control over claims submitted to health care benefit programs and routinely upcoded the billings entered by Drs. Lee and Morton. Further, having reviewed the evidence and

transcript in this case, the Court is confident that Defendant's convictions did not rest upon "bad charting" and were not contrary to the weight of the evidence.

Second, the evidence in question was also admissible as "inextricably intertwined," as it provided a "coherent and comprehensible story regarding the commission of the crime." *DeGeorge*, 380 F.3d at 1220. As in *DeGeorge*, the evidence of prior audits and the whiting out evidence "had an important factual connection to several counts contained in the indictment[.]" *Id.* at 1220. Here, Dr. Lee's testimony regarding drafting a false chart note to match what had been billed was necessary to apprise the jury of Defendant's efforts to conceal his unlawful activity in circumventing audits. *See also Dearing*, 504 F.3d at 901. Thus, the jury learned that Defendant's instruction to white out the "created" on date intentionally concealed from auditors that the chart notes were not created at the time of service. Through this evidence, the jury permissibly learned that Defendant was aware of how to manipulate audits to circumvent fraud detection. This also allowed the jury to properly evaluate the entirety of Defendant's scheme to defraud in the context of charged Counts 1-2.

Third, the evidence was admissible as "inextricably intertwined" to allow the jury to understand Paula Klingele's statement that Defendant instructed her not to tell law enforcement about the L & I audit and whiting out evidence. ER 107, 284. Defendant did not object to this statement. ER 107, Tr. 282-84. This allowed the jury to evaluate Defendant's intent to conceal his allegedly fraudulent activity from law enforcement on the date the search warrant was executed in August of 2007. This evidence was necessary to "allow the jury to make sense of the testimony, in its proper context." *Ramirez-Jiminez*, 967 F.2d 1321 at 1327.

After a thorough review of the record, the Court finds the evidence was properly admitted as inextricably intertwined to the scheme to defraud as alleged by the Government at trial. Second, this evidence gave the jury the proper context

to evaluate the entirety of Defendant's scheme to defraud various health care benefit programs. Therefore, a new trial is not required under Rule 33, as the evidence does not preponderate heavily against the verdict. *United States v. Pimental*, 654 F.2d 538, 545 (9th Cir. 1981).

**d. Insurance Reimbursement Evidence Was Properly Admitted as Inextricably Intertwined**

The Defendant also argues the Court erred in admitting evidence of his refusal to refund insurance companies after patients complained about services billed, but not performed. ECF No. 245 at 11, 33-34. Defendant contends this evidence was another example of 'other acts' evidence improperly admitted as inextricably intertwined to the schemes alleged. *Id.* He also alleged that such evidence was "unexpected by the defense." *Id.* at 11; *see also* ER 297-98, Tr. 807-10.

The Government submits that such evidence of Defendant's failure or refusal to reimburse health care benefit programs is evidence of his knowledge that services had not been performed and his intent to defraud, as evidence that he retained monies for services not rendered. ECF No. 254, 15, 29-31. The Government asserts that such evidence is direct evidence of the scheme to defraud and is inextricably intertwined with the charged scheme in regard to patient S.W., Counts 42-44. [12] *Id.* The Government also responds that evidence of refunds was an issue known to Defendant, well in advance of trial. *See, e.g.*, ECF No. 127 at 2-3; ECF No. 163 at 12, 14-15.

Here, Defendant concedes that reimbursement evidence was related to patient S.W., charged as the false statement Counts 42-44. ECF No. 245 at 11. S.W. testified that on August 18, 2010, she had her toes sanded by a medical assistant at Advanced Podiatry. ER 173-75, Tr. 315-323. Subsequently, she was

---

[12] The Defendant was ultimately acquitted of Counts 42-44. ECF No. 217.

billed for three avulsions. *Id.*; ER 520, Ex. 48. S.W. also testified that after several complaints about billings for services not received, she was told her bill was taken care of and that she owed nothing. ER 174,Tr. 318-19. The Government also introduced evidence that S.W.'s insurance company, HMA, was not reimbursed. ER 91-93, Tr. 217-25. The Government provided further testimony that in response to patient complaints, Defendant would write off balances, but not refund the health care benefit providers. ER 273-74, Tr. 712-15.

Therefore, the Court agrees with the Government that this evidence was properly characterized as "inextricably intertwined," as it constituted a part of the transaction that served as the basis for the criminal charge, namely Counts 42-44. *Vizcarra-Martinez*, 66 F.3d at 1012.

**2. Other Errors Identified by Defendant Do Not Require a New Trial**

**a. General Evidence**

Defendant contends that he was convicted on general evidence and innuendo. ECF No. 245 at 19, 35. The Court disagrees. As set forth above, the Court weighed the evidence on the counts of conviction, and concluded the evidence is sufficient and not contrary to the jury's verdict on all health care fraud counts of conviction.

**b. Evidence of a Folder Marked "Refunds – Ha Ha Ha"**

Defendant complains that the Government referenced a folder marked "Refunds – Ha Ha Ha" in opening statement, yet failed to present evidence of it during trial. ECF No. 245 at 26, 36; *see* Govt.'s Opening, ECF No. 241 at 7.

The Government introduced testimony regarding the existence of a refunds folder, discovered after the search warrant was executed at Advanced Podiatry in August of 2007. ER 59, Tr. 179-80. Special Agent Terami, FBI, testified that Ms. Martinell disclosed the existence of the refunds folder to her in 2008. ER 285, Tr. 757. Agent Simpson, HHS-OIG, testified to the same. ER 59, Tr. 179-80. Ms.

Martinell, as the Defendant's former office manager, testified that she maintained a refunds folder which included refunds that insurance companies were entitled to, but not reimbursed by Advanced Podiatry. ER 274, Tr. 715. Ms. Martinell did not testify whether the folder was marked "Refunds – Ha Ha Ha." Investigators testified at trial that the folder was not requested from Ms. Martinell, as she no longer worked for Advanced Podiatry, after law enforcement learned of the folder's existence. ER 59, Tr. 179-80. Here, The Court can discern no error in the presentation of such testimony. As such, a new trial on this ground is not warranted.

**c. Testimony Regarding Defendant's Attorney John Maxwell**

Defendant next argues that a new trial is required because a witness improperly called into question the credibility of John Maxwell, an attorney who assisted lead Defense counsel Phillip Wetzel. ECF No. 245 at 26. Defendant submits that the Government elicited testimony of Mr. Maxwell's "lack of trustworthiness" from Barbara Graham, a former biller at Advanced Podiatry. *Id.*

The Government responds that counsel questioned the witness about why she gave a prior inconsistent statement to Mr. Maxwell. ECF No. 254 at 33. The Government argues this question may have been premature, but emphasizes that Defense Counsel, on cross-examination, did inquire about the prior inconsistent statement. *Id.* Therefore, this line of questioning would have been proper on redirect. *Id.* at 34.

Ms. Graham was interviewed by Mr. Maxwell on the day after the search warrant was executed at Advanced Podiatry in 2007. ER 156, Tr. 23. She testified that she was not honest in the interview "because [she] didn't trust John [Maxwell]." *Id.*

The Court notes that Mr. Maxwell did not enter a notice of appearance in this case. *See* Docket Sheet. Also, after a belated objection by Defense counsel, the

Court offered to strike the disputed testimony on relevancy grounds, to which Defense counsel responded "we can wait." ER 157, Tr. 28. The Court then denied Defense Counsel's request for a mistrial. ER 158, Tr. 29. At this point in the trial, Mr. Maxwell had yet to participate in the trial or to examine any witnesses. He was also not present at Defendant's counsel table at this time. As the Court noted, the jury was unaware of any controversy involving Mr. Maxwell's credibility. ER 158, Tr. 29. Subsequently, on cross-examination, Defense Counsel proceeded to ask Ms. Graham about her prior statements made to Mr. Maxwell, including statements concerning an unemployment hearing involving Defendant and unrelated to the instant case. ER 166, Tr. 63-64. Thus, any prior error by the Government regarding Ms. Graham's testimony was harmless. *See also United States v. De La Vega*, 913 F.2d 861, 867 (11th Cir. 1990) (finding "no evidence of government involvement in misconduct, since there exists no governmental duty to muzzle prosecution witnesses on cross-examination" that offer disparaging remarks as to defense counsel).

**d. Evidence Regarding Jamie Holden and the Removal of Business Records Did Not Prejudice Defendant or Confuse the Jury**

Defendant argues that evidence related to the actions of his wife, Jamie Holden, created the potential for jury confusion before it was struck. ECF No. 245 at 36. The Government counters that this evidence was properly admitted, as it became relevant during Defendant's case-in-chief. ECF No. 254 at 34.

During the Government's direct examination of Paula Klingele the Court struck any testimony related to Jamie Holden removing boxes of material from the Defendant's home after the search warrant was executed. ER 102-03, Tr. 262-65. The Court found the prejudice to Defendant was too great and did not allow any testimony from Ms. Klingele regarding Mrs. Holden and the removal of the boxes. *Id.*

Defendant then called Mrs. Holden in his case-in-chief to testify regarding insurance reimbursements. ER 311-17, Tr. 364-85. Mrs. Holden authenticated Defense Exhibit 501, a summary document of insurance refunds issued by Mrs. Holden. ER 312, Tr. 867. Over the Government's objection, Exhibit 501 was admitted. ER 313, Tr. 869. The Government then sought to cross-examine Mrs. Holden on the removal of boxes from the Defendant's home, arguing such inquiry was relevant to her bias and credibility. ER 316, Tr. 882.

The Court then issued a limiting instruction and informed the jury that this evidence was not admissible as to Defendant, and went only to Mrs. Holden's credibility. ER 316-17, Tr. 884-85. On cross-examination the Court allowed the Government to inquire into the removal of boxes from their home after the execution of the search warrant at Advanced Podiatry. ER 317, Tr. 886. Mrs. Holden testified she removed the boxes as she was afraid law enforcement would seize them. ER 317, 886. The records removed included accounts payable and employee records, which were returned to the Holden residence one week after their removal. ER 317, Tr. 886-87.

Here, the Court cannot discern any prejudice to the Defendant or how this evidence confused the jury before it was stricken during Ms. Klingele's direct. Further, Defendant does not argue the limiting instruction given during the testimony of Mrs. Holden, which the Court notes became relevant during his case-in-chief, was deficient. In addition, it is presumed that jurors' possess the ability to follow limiting instructions. *See Ortiz-Sandoval v. Gomez,* 81 F.3d 891, 899-900 (9th Cir. 1996).

**e. Advanced Podiatry Records Were Properly Admitted Through Barbara Graham**

Defendant next argues that the Court improperly admitted stolen business records under Fed R. Evid. 803(6). ECF No. 245 at 37. Specifically, he argues that Barbara Graham, an Advanced Podiatry billing employee who removed records

from the office and turned them over to law enforcement, did not act in the "regular course of business." *Id.* As a result, Ms. Graham was biased and unable to serve as a reliable source to authenticate such records -- essentially breaking the chain of custody as she lacked trustworthiness. *Id.*

The Government counters that under Rule 803(6), a witness does not have to be the custodian of documents offered into evidence to establish foundation. ECF No. 254 at 35-36. The Government argues "[t]he phrase 'other qualified witness' is broadly interpreted to require only that the witness understand the record-keeping system." *United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993) (holding that former employees were familiar with the contents and preparation of the exhibits in question and permitted to lay foundation) (internal citation omitted).

Ms. Graham testified that while employed at Advanced Podiatry she handled electronic transmissions of billing information. ER 152, Tr. 5-6. At trial the Government sought to introduce patient records printed out by Ms. Graham in 2011 from Advanced Podiatry's computer system. ER 158, Tr. 32. These records principally related to patient S.W. (false statement Counts 42-44). *Id.* Defendant objected to the admission of these records, as he maintained they were not kept in the regular course of business. ER 158, Tr. 32. Defendant argued the records were printed out by Ms. Graham from Advanced Podiatry and then taken and stored in her home. *Id.* Approximately 30 days later, Ms. Graham turned the records over to the FBI, fearing she might be charged with a crime. ER 167, Tr. 68.

Hearsay evidence may be admissible under the business records exception if the evidence is a record of regularly conducted activity and was (1) made at or near the time of the event by someone with knowledge; (2) the record was kept in the course of regularly conducted activity of a business or organization; (3) making the record was a regular practice of that activity; (4) all of these conditions are shown by the testimony of the custodian or another qualified witness; and (5) neither the

source of information nor the method or circumstances of preparation indicate a lack of trustworthiness. Fed. R. Evid. 803(6). "Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6), even though the printouts themselves are not kept in the ordinary course of business." *United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002). Furthermore, the foundation with respect to a computer generated business record should focus on reliability. *U-Haul Intern., Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043–44 (9th Cir. 2009)

Here, the Court initially determined Ms. Graham could not properly authenticate the computer printouts in question because she was adverse to the Defense. ER 160, Tr. 37-39. The Court then changed its ruling based on her subsequent testimony, and found that Ms. Graham was sufficiently familiar with Advanced Podiatry billing and patient records to act as custodian. ER 162, Tr. 45. More importantly, the Court was satisfied that the computer printouts maintained by Ms. Graham were sufficiently reliable and "completely consistent with the documents . . . already admitted as proper exhibits." ER 162-63, Tr. 46-49.

The Court also noted that Rule 803(6)(E) expressly provides for the exclusion of a business record if the source of information indicates a lack of trustworthiness. *See United States v. Licavoli*, 604 F.2d 613, 622 (9th Cir.1979). However, the Court found Ms. Graham's testimony, despite her adverse interest, was sufficient to properly authenticate the computer printouts. *See* Fed. R. Evid. 901(a) ("the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). The court also found the records need not be excluded because the records proffered to the FBI were entirely consistent when compared to other exhibits obtained from the search warrant and properly admitted at trial. ER 162-63, Tr. 48-49. The Court specifically noted the records were "the same format and the same font, and they're on the same forms . . . ." ER

163, Tr. 49. Any concern of Ms. Graham's alleged bias would be for the jury to consider, as the foundation for the computer printouts was sufficiently established for their consideration. Thus, the Court properly evaluated the evidence under the business records exception, and the request for a new trial on this ground is denied.

**f. Evidence of the Audio Recording Was Properly Excluded**

Defendant maintains that a new trial is required because the Court excluded an audio recording of a June 2007 conversation between Defendant and Dr. Lee recorded by the Government. ECF No. 245 at 38. For example, Defendant asserts that his statement to Dr. Lee "that he [was] just trying to make sure that we bill for what we did," was admissible under the present sense impression to the hearsay rule. *Id.*; ER 363, Tr. 1065.

The Government responds that the Court properly excluded the recording. ECF No. 254 at 36. The Government submits the recording was inadmissible as a prior consistent statement under Fed. R. Evid. 801(d)(1)(B), as it was made after Defendant had a motivation to lie. *Id.* The Government argues Defendant learned of the ongoing federal investigation into Advanced Podiatry by March or April of 2007. *Id.* The Government also claims that the Court correctly determined the recording was inadmissible under the present sense impression. *Id.*

A party offering a prior consistent statement must establish four elements under Rule 801(d)(1)(B): "(1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose." *United States v. Bao*, 189 F.3d 860, 864 (9th Cir. 1999).

Here, the recording of the conversation with Dr. Lee occurred on June 12, 2007. ER 146, Tr. 127-28. The evidence at trial established that Defendant was aware of the investigation by March or April of 2007. ER 184, Tr. 356-57; ER 208, Tr. 454. Hence, any prior consistent statement made during the recording with Dr. Lee was made after Defendant's motive to testify falsely arose. The Court properly excluded the audio recording with Dr. Lee on this ground.

Defendant also argues the statement was admissible under the present sense impression exception to the hearsay rule. ER 363, Tr. 1063. Pursuant to Fed. R. Evid. 803(1), "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it."

In this case, Defendant's statement that he attempted to bill and code correctly was not a present sense impression because it did not describe or explain an event, but rather went to the truth of whether he properly billed and coded. ER 5, Tr. 18. Thus, the statement identified by Defendant was inadmissible hearsay and did not meet the present sense exception under Rule 803(1). Therefore, a new trial is not required on either of these evidentiary bases.

**g. Defendant Was Not Convicted on a Civil Standard of Liability**

Defendant argues that the Government "mixed up civil liability with criminal action." ECF No. 245 at 15-19. He argues such error is grounds for a new trial as it likely confused the jury. *Id.* Defendant points to testimony by Agent Simpson and the Government's expert witness Dr. Tanner as examples.

The Government responds that it did not inject a civil standard of liability into the trial. ECF No. 254 at 37-39. The Government also argues that the testimony of Dr. Tanner was proper and did not, as Defendant suggests, allow the jury to convict him on an "absence of evidence." *Id.*

First, the Government did not inject a civil standard of liability into the case regarding Microvas. As detailed above, there was sufficient evidence to secure

Defendant's health care fraud convictions on Counts 14-18, 21, and 24-40. The Government also points out that Defendant raised the issue of Microvas billing to Agent Simpson, not the Government. *Compare* ER 44, Tr. 117-19, with ER 58-59, Tr. 175-77.

Second, Dr. Tanner's expert testimony was appropriate in this case. *See United States v. Martinez*, 588 F.3d 301, 315 (6th Cir. 2009) (relying on expert testimony in a health care fraud case); *see also United States v. Canon*, 141 Fed. App'x 398, 405 (6th Cir. 2005) (upholding doctor's conviction under 18 U.S.C. § 1347 because government witness testified that patient records did not support the doctor's use of billing codes and "a rational jury could infer a failure to perform from a failure to document"). In this case, the Government stressed the importance of chart documentation as discussed *supra*. Dr. Tanner's review of the patient chart notes, in conjunction with patient testimony and the testimony of former Advanced Podiatry employees, was appropriate evidence for the jury to consider in determining whether a service was performed. Defendant was not convicted on an "absence of evidence" or a civil liability standard. Thus, his motion for a new trial on these grounds is denied.

## IV. CONCLUSION

Based on the foregoing, Defendant's Motions for Acquittal and a New Trial are denied. The Court finds the evidence sufficient to support the jury's verdict on Counts 3-6, 7-10, 14-18, 21, 24-40, and 41of health care fraud. Further, the errors alleged by Defendant do not require a new trial.

///

///

///

///

///

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant's Motion for Acquittal, ECF No. 219 is **DENIED**.

2. Defendant's Motion for New Trial, ECF No. 221 is **DENIED**.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and forward copies to counsel.

**DATED** this 16th day of May, 2013.

*s/Robert H. Whaley*
ROBERT H. WHALEY
Senior United States District Judge